**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| LEXINGTON INSURANCE COMPANY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Case No. |
| BLUE CROSS AND BLUE SHIELD | ) | |
| ASSOCIATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |
| | ) | |

## COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiff LEXINGTON INSURANCE COMPANY ("Lexington"), in support of its Complaint for Declaratory Judgment against Defendant BLUE CROSS AND BLUE SHIELD ASSOCIATION ("BCBSA"), alleges as follows:

## INTRODUCTION

1. Lexington seeks a declaration in this action that no insurance coverage is afforded to BCBSA under a certain insurance policy Lexington issued to BCBSA for an underlying lawsuit filed by Woman's Recovery Center, LLC, and others, against BCBSA and its member entities in the U.S. District Court for the Central District of California pending under Consolidated Case No. 8:20-cv-00102 (the "Underlying Lawsuit"). The Underlying Lawsuit as defined herein also includes any cases which are, or may be, deemed consolidated and/or "related" cases as designated by the Court under Case No. 8:20-cv-00102, inclusive of U.S. District Court, Central District of California, Case Nos. 8:20-cv-02424, 8:20-cv-02412 and 8:21-cv-00495.

1

2.      Lexington issued a Specialty Risk Protector insurance policy to BCBSA bearing No. 01-340-41-74 (the "Policy"). A certified copy of the Policy is attached hereto and incorporated herein by reference as **Exhibit 1**.

3.      BCBSA provided notice of the Underlying Lawsuit to Lexington and requested insurance coverage for the Underlying Lawsuit from Lexington under the Policy.

4.      Lexington denied insurance coverage under the Policy for the Underlying Lawsuit to BCBSA.

5.      BCBSA has contested Lexington's denial of insurance coverage under the Policy for the Underlying Lawsuit.

6.      A controversy exists between the parties to this action regarding insurance coverage for the Underlying Lawsuit under the Policy, and an entry of a declaratory judgment is required to resolve the controversy.

## THE PARTIES

7.      Plaintiff Lexington is incorporated in Delaware with its principal place of business in Boston, Massachusetts, and it is therefore a citizen of Delaware and Massachusetts for purposes of federal jurisdiction.

8.      Defendant BCBSA is incorporated in Illinois with its principal place of business in Chicago, Illinois, and it is therefore a citizen of Illinois for purposes of federal jurisdiction.

## JURISDICTION AND VENUE

9.      This court has jurisdiction over this action pursuant to 28 U.S.C. § 1332 respecting diversity jurisdiction insofar as it involves citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

10.     Venue is appropriate under 28 U.S.C. § 1391 because the insurance policies at issue in this dispute were issued to BCBSA within this district, and performance under the Policy would be in this district as to BCBSA.

## THE UNDERLYING LAWSUIT

11.     The Underlying Lawsuit is proceeding under a Second Amended Consolidated Complaint (the "Consolidated Complaint"). A copy of the Consolidated Complaint is attached hereto as **Exhibit 2**.

12.     The Underlying Lawsuit is brought by out-of-network substance use disorder treatment providers and clinical laboratories. (Ex. 2, ¶64).

13.     The Consolidated Complaint in the Underlying Lawsuit alleges that BCBSA and its member entity health insurance providers, which members it refers to as the "Blue Cross and Blue Shield Defendants," provide coverage for out-of-network substance use disorder treatment and laboratory services for each of the 1,792 Blue Cross Blue Shield insureds at issue in the Underlying Lawsuit. (Ex. 2, ¶65).

14.     The Consolidated Complaint alleges that BCBSA is controlled and funded by the Blue Cross and Blue Shield member entities and operates as the licensor of the Blue Cross and Blue Shield trademarks and trade names, and exists solely for the benefit of the Blue Cross and Blue Shield member entities and to facilitate their concerted activities. (Ex. 2, ¶55).

15.     The Consolidated Complaint alleges that BCBSA and its member entities have agreed to participate in "the Blue Card Program and the National Accounts Program" in pursuit of a horizontal agreement to lock in sub-competitive reimbursement rates. (Ex. 2, ¶58).

16.     The Consolidated Complaint alleges that the Blue Card Program:

[I]s a program that enables members of one BCBS plan to obtain health care services while traveling or living in another BCBS plan's service area. Under this

3

> program, when a member of a BCBS plan obtains covered health care services in another state, the "local" or "host" BCBS plan (*i.e.*, the plan located in the state where the services are provided) receives the claim(s) from the local provider and routes the claim information along with pricing data to the "home" BCBS plan. The "home plan" is the BCBS plan that issues, insures and/or administers the health plan for the member.

(Ex. 2, ¶58).

17.     The Consolidated Complaint alleges that the "National Accounts Program functions in a similar manner [to the Blue Card Program] and generally applies to employee benefit plans with insured members in multiple states." (Ex. 2, ¶58).

18.     The Consolidated Complaint alleges that:

> These programs have been established by a horizontal agreement between the Blue Cross and Blue Shield Defendants. The Blue Card Program is managed by a Committee of Blue Cross and Blue Shield Defendants sitting on the Inter-Plan Programs Committee. These programs, among other national programs, lock in fixed, discounted reimbursement rates that each Blue Cross and Blue Shield Defendant achieves through market dominance in its service area and makes subcompetitive rates available to all other Blue Cross and Blue Shield Defendants without the need for negotiation or contracting. Because many Blue Cross and Blue Shield Defendants have large numbers of members outside of their service areas, and rather than forming competing networks of providers in the other service areas, the Blue Cross and Blue Shield Defendants pay the Home Plan a kickback, called an Access Fee, and thereby share the excess profits they achieve through the sub-competitive prices that the Blue Cross and Blue Shield Defendants pay to Providers.

(Ex. 2, ¶58).

19.     The Consolidated Complaint alleges that the Underlying Lawsuit plaintiffs rendered treatment to Blue Cross Blue Shield insureds in reliance on an assignment of benefits under Blue Cross Blue Shield insurance plans. (Ex. 2, ¶68).

20.     The Consolidated Complaint alleges that:

> Instead of paying Plaintiffs per the plan documents and the law, and in accordance with Defendants' agreements, representations and promises to Plaintiffs, Defendants engaged in unfair, unreasonable, illegal, incomplete, fraudulent and systematic policies, practices and decisions – with an emphasis on profits over

patients – and paid Plaintiffs, as a group, an average of 18.55% of their covered charges. It was only after Plaintiffs rendered the treatment and services at issue that Defendants refused to properly compensate Plaintiffs for the covered treatment and services rendered to Defendants' insureds.

(Ex. 2, ¶70).

## MDL LAWSUIT

21.     BCBSA and certain of its member entities were also defendants in a predecessor multi-district litigation ("MDL") referred to as "In Re: Blue Cross Blue Shield Antitrust Litigation (Jerry L. Conway, D.C., et al) in the U.S. District Court for the Northern District of Alabama under Master File No. 2:13-cv-20000-RFP (the "MDL Lawsuit"). A copy of the Corrected Consolidated Second Amended Provider Complaint filed in the MDL Lawsuit is attached hereto as **Exhibit 3**.

22.     Coverage is not in dispute between Lexington and BCBSA under the Policy for the MDL Lawsuit, but it is a defined "Event" under Endorsement #3 in the Policy, as discussed below, and Lexington therefore describes it herein.

23.     The MDL Lawsuit was brought by a class of providers of healthcare services and/or equipment and/or supplies and medical and surgical facilities, alleging BCBSA and its member entities engage in conduct that violates the Sherman Antitrust Act.

24.     The MDL Lawsuit alleged that BCBSA and its member entities:

have agreed with each other to carve the United States into "Service Areas" in which only one Blue can sell insurance, administer employee benefit plans or contract with healthcare providers (the "Market Allocation Conspiracy"). Defendants have engaged in a horizontal market allocation, which is illegal under a *per se*, quick look or rule of reason analysis. The *quid pro quo* for this illegal Market Allocation Conspiracy is a horizontal Price-Fixing and Boycott Conspiracy under which every other Blue gets the benefit of the artificially reduced prices that each Blue pays to healthcare providers, the Blues get those benefits through the national programs that the Blues have collectively established, including the Blue Card Program and the National Accounts Programs. The Market Allocation Conspiracy reduces the competition that each

Blue faces and allows it to reduce the prices that it pays to healthcare providers. The Price Fixing and Boycott Conspiracy fixes those prices for all Blues, gives them the benefit of those reduced, fixed prices and further provides that the participating Blues will collectively boycott all Providers outside of their Service Areas.

(Ex. 3 ¶ 1).

## **THE POLICY**

25.     The Policy was issued by Lexington to BCBSA for the Policy Period of May 14, 2020 to May 14, 2021.

26.     Endorsement #3 to the Policy provides as follows:

SPECIFIC INVESTIGATION/CLAIM/LITIGATION/EVENT EXCLUSION ENDORSEMENT

In consideration of the premium charged, it is hereby understood and agreed that, without limiting the other exclusions of the policy, the Insurer shall not be liable to make any payment for Loss alleging, arising out of, or resulting, directly or indirectly, from:

(a)     any Claim, notice, event, damage, investigations or actions referred to in item 1. Below (the "Event");

(b)     the prosecution, adjudication, settlement, disposition, resolution or defense of: (a) the Event or (b) any Claim arising from, in connection with or relating to the Event; or

(c)     any Wrongful Act, underlying facts, circumstances, acts, errors or omissions in any way relating to the Event.

1.     Event shall mean:

        * * *

The Provider Track action filed by Jerry L. Conway, D.C., et al. against Blue Cross Blue Shield of Alabama, et al. in the United States District Court for the Northern District of Alabama, Southern Division, on or about 11/25/2014 (Master File No. 2:13-CV-20000-RFP).

2.     It is further understood and agreed that the Insurer shall not be liable for any Loss in connection with any Claim alleging, arising out of, based upon, attributable to or in any way related, directly or indirectly, in part or

6

in whole, to any acts and/or Third Party Events which are Related Acts in relation to the Event, regardless of whether or not such Claim involved the same or different Insureds, the same or different legal causes of action or the same or different claimants or is brought in the same or different venue or resolved in the same or different forum.

27. The term Related Acts as used in Endorsement #3 is defined at Clause 2.(r) of the Policy's General Terms and Conditions as follows:

(r) "Related Acts" means all First Party Events and Third Party Events which are the same, related or continuous and all First Party Events and Third Party Events which arise from a common nucleus of facts. All Related Acts shall be considered to have occurred at the time the first such Related Act occurred.

28. The term "Third Party Coverage Section" is defined at Clause 2.(v) of the Policy's General Terms and Conditions as "the event(s) or circumstance(s) contained in the definition of Third Party Event in a Third Party Coverage Section."

29. The Policy includes a Specialty Professional Liability ("SPL") Coverage Section subject to a $10 million Limit of Liability.

30. The SPL Coverage Section is a Third Party Coverage Section which defines Third Party Event at Clause 2.(j) as "any Wrongful Act," which term "Wrongful Act," is defined at Clause 2.(k) as amended by Endorsement #5.

31. The SPL Coverage Section Insuring Agreements provides, in part, as follows:

ERRORS AND OMISSIONS INSURING AGREEMENT

The Insurer shall pay on an Insured's behalf all Loss in excess of the applicable Retention that such Insured is legally obligated to pay resulting from a Claim alleging a Wrongful Act.

32. Pursuant to Endorsement #5 in the Policy, Clause 2. DEFINITIONS, paragraph (k) in the SPL Coverage Section, the definition of Wrongful Act is deleted and replaced with the following:

(k)     "Wrongful Act" means any negligent act, error or omission, misstatement or misleading statement in the performance of Professional Services for others occurring on or after the Retroactive Date and prior to the end of the Policy Period, but only to the extent such Professional Services were:

(1)     performed by an Insured; or
(2)     performed by any other person or entity contracted by the Company to perform Professional Services for or on behalf of a Company, and for whom a Company is vicariously liable.

33.     Endorsement #5 in the Policy amends Clause 3. EXCLUSION in the SPL

Coverage Section to provide as follows:

This policy shall not cover Loss in connection with a Claim made against an Insured:

* * *

MC(d) alleging, arising out of, based upon or attributable to Antitrust Activity.

34.     Endorsement #5 to the Policy amends Clause 2. DEFINITIONS in the SPL

Coverage Section to include and define Antitrust Activity as follows:

MC(a) "Antitrust Activity" means any actual or alleged price fixing, price discrimination, predatory pricing, monopolization, restraint of trade, unfair competition, unfair or deceptive trade practice, or violation of any federal or state antitrust law;

## COUNT I – DECLARATORY JUDGMENT:
## ENDORSEMENT #3 IN POLICY BARS COVERAGE FOR UNDERLYING LAWSUIT

35.     Lexington incorporates and restates each and every allegation set forth in paragraphs 1-34 of this Complaint as if alleged in this Paragraph 35.

36.     The MDL Lawsuit is an "Event" as defined in Endorsement #3 to the Policy.

37.     The Underlying Lawsuit is arising from, in connection with or relating to the MDL Lawsuit.

38.     The Underlying Lawsuit seeks relief that is alleging, arising out of, or resulting, directly or indirectly, from any Wrongful Act, underlying facts, circumstances, acts, errors or omissions in any way relating to the MDL Lawsuit.

39.     The Underlying Lawsuit is alleging, arising out of, based upon, attributable to or in any way related, directly or indirectly, in part or in whole to acts and/or Wrongful Acts which are Related Acts in relation to the MDL Lawsuit.

40.     Paragraph 2. in Endorsement #3 provides that such paragraph may apply regardless of whether a Claim involved the same or different Insureds, the same or different legal causes of action or the same or different claimants or is brought in the same or different venue or resolved in the same or different forum.

41.     The Underlying Lawsuit is a Claim and/or seeks Loss which is excluded from coverage by Endorsement #3 in the Policy.

WHEREFORE, Lexington requests that this Court enter a judgment finding and declaring that Lexington has no obligation to afford defense or indemnity coverage under the Policy to BCBSA for the Underlying Lawsuit.

### COUNT II – DECLARATORY JUDGMENT: EXCLUSION MC(d) IN POLICY BARS COVERAGE FOR UNDERLYING LAWSUIT

42.     Lexington incorporates and restates each and every allegation set forth in paragraphs 1-34. of this Complaint as if alleged in this Paragraph 42.

43.     The Underlying Lawsuit is alleging, arising out of, based upon or attributable to actual or alleged price fixing, price discrimination, predatory pricing, monopolization, restraint of trade, unfair competition, unfair or deceptive trade practice, or violation of any federal or state antitrust law.

44.     The Underlying Lawsuit alleges, arises out of, is based upon or attributable to Antitrust Activity as defined in the Policy.

45.     The Underlying Lawsuit is a Claim and/or seeks Loss that is excluded from coverage under the Policy by Exclusion MC(d).

WHEREFORE, Lexington requests that this Court enter a judgment finding and declaring that Lexington has no obligation to afford defense or indemnity coverage under the Policy to BCBSA for the Underlying Lawsuit.

## COUNT III – DECLARATORY JUDGMENT:
## UNDERLYING LAWSUIT DOES NOT SATISFY POLICY INSURING AGREEMENT

46.     Lexington incorporates and restates each and every allegation set forth in paragraphs 1-34. of this Complaint as if alleged in this Paragraph 46.

47.     The Underlying Lawsuit does not allege any negligent conduct by BCBSA.

48.     The Underlying Lawsuit does not allege conduct in the performance of Professional Services for others.

49.     The Underlying Lawsuit does not allege a Wrongful Act against BCBSA.

50.     The Underlying Lawsuit does not seek covered Loss against BCBSA.

51.     The Underlying Lawsuit does not satisfy the requirements for insurance coverage under the SPL Coverage Section Insuring Agreements.

WHEREFORE, Lexington requests that this Court enter a judgment finding and declaring that Lexington has no obligation to afford defense or indemnity coverage under the Policy to BCBSA for the Underlying Lawsuit.

## COUNT IV – DECLARATORY JUDGMENT:
## OTHER TERMS AND CONDITIONS GOVERNING INSURANCE COVERAGE

52.     Lexington incorporates and restates each and every allegation set forth in paragraphs 1-34. of this Complaint as if alleged in this Paragraph 52.

53.     If it were deemed covered, the Underlying Lawsuit is a Systemic Claim subject to a $7.5 million Retention and 40% coinsurance pursuant to Endorsement #11 of the Policy.

54.     Other terms, conditions and/or exclusions in the Policy apply to limit or preclude coverage under the Policy for the Underlying Lawsuit.

WHEREFORE, Lexington requests that this Court enter a judgment finding and declaring that Lexington has either no obligation to afford defense or indemnity coverage under the Policy to BCBSA for the Underlying Lawsuit, or coverage is otherwise limited under the Policy for the Underlying Lawsuit.

## COUNT V – DECLARATORY JUDGMENT:
## SPECIFIC PERFORMANCE OF POLICY'S DISPUTE RESOLUTION PROCESS

55.     Lexington incorporates and restates each and every allegation set forth in paragraphs 1-34. of this Complaint as if alleged in this Paragraph 55.

56.     The Policy includes an ADR provision at Clause 15. of the General Terms and Conditions, which provides that disputes or differences under the Policy must first be submitted to a non-binding mediation process prior to litigation.

57.     Lexington has filed this litigation out of an abundance of caution in light of the Illinois estoppel doctrine, which may apply where an insurance policy includes a duty to defend in the insuring agreement, and if it applies, it may compel Lexington to initiate coverage litigation to confirm its coverage denial position within a reasonable time.

58.     Lexington does not concede the estoppel doctrine applies here, but it requests this Court's confirmation that it may proceed to comply with the ADR provisions in the Policy while this action is stayed, while preserving all of its rights in relation to the Illinois estoppel doctrine.

WHEREFORE, Lexington requests that this Court take jurisdiction over this action and confirm that Lexington has complied with any putative obligations under the Illinois estoppel doctrine by initiating this action, while staying this action so that Lexington and BCBSA may comply with the ADR Clause in the Policy before continuing with this litigation, as appropriate.


Dated: August 18, 2021                          Respectfully submitted,

                                                **LEXINGTON INSURANCE COMPANY**

                                    By:     s/ David T. Brown
                                            David T. Brown
                                            Kyle McConnell
                                            KAUFMAN DOLOWICH
                                            & VOLUCK, LLP
                                            135 S. LaSalle Street, Suite 2100
                                            Chicago, IL 60603
                                            T: (312) 646-6744
                                            F: (312) 896-9403
                                            Email: dbrown@kdvlaw.com
                                                     kmcconnell@kdvlaw.com

4831-9726-9748, v. 2